James A. GRANTHAM and Nancy H.
Grantham, Respondents,

v.

SHELTER MUTUAL INSURANCE
CO., Appellant.

Nos. WD 37429, WD 37440.

Missouri Court of Appeals,
Western District.

Dec. 16, 1986.

Michael A. Dallmeyer, Hendren and Andrae, Jefferson City, for appellant.

Roger M. Baron, The Woodlands, Tex., for respondents.

Before TURNAGE, P.J., and SHANGLER and KENNEDY, JJ.

TURNAGE, Presiding Judge.

James A. Grantham and his wife, Nancy H. Grantham, brought suit on a policy of property insurance. The court entered judgment in favor of the Granthams for $10,629. Shelter contends that the court in this bench-tried case erroneously found that Shelter was not entitled to replace the insured sterling silver. Shelter also argues that the policy limited Shelter's liability to the replacement value of the sterling silver. The Granthams cross-appeal, arguing that the trial court should have awarded prejudgment interest and vexatious refusal damages and that the court attempted to modify the judgment after it had become final. The Granthams also move to dismiss, arguing that the Shelter appeal was untimely.

Affirmed in part, and reversed in part.

On September 6, 1983 the Granthams' house was burgled. The burglars stole property from the house, including ten place settings of Wallace Grand Baroque Sterling Silverware, a set of Oneida silver-plated flatware, and a sapphire pendant, all of which were insured under an inland marine insurance policy issued by Shelter Mutual. The policy insured against loss or damage by theft, as well as by other hazards not relevant to this case.

Attached to the policy was a sheet entitled "Property Covered." That sheet listed the various categories of insured property and the "Amount of Insurance" for each such category; opposite the listing for silverware, the figure $11,714.00 was listed as the "Amount of Insurance." The same attached sheet provided a space for scheduling of each item of insured property; the items were not actually scheduled on that page, but the sheet incorporated a second "Attached Schedule." The "Attached Schedule" was a separate sheet with the headings: "Item No.," "Description," and "Limit of Liability." The sterling silver was listed as item No. 2 and under the "Limit of Liability" heading was the figure $11,280. (Several other items of silverware brought the total "Limit of Liability" for silverware up to the $11,714 figure listed on the "Property Covered" sheet.)

On a page entitled "Conditions" the basic policy contained these two paragraphs:

10. VALUATION. The Company shall not be liable beyond the actual cash value of the property at the time any loss occurs. The loss shall be ascertained or estimated according to such actual cash value with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost to repair or replace the same with material of like kind and quality.

\*      \*      \*      \*      \*      \*

12. COMPANY'S OPTIONS. It shall be optional with the Company to take all,

or any part, of the property at the agreed or appraised value, or to repair, rebuild or replace the property destroyed or damaged with other of like kind and quality within a reasonable time, on giving notice of its intention to do so within sixty (60) days after the receipt of the proof of loss herein required.

On the "Property Covered" sheet there was a paragraph entitled "SPECIAL CONDITIONS." Under that paragraph heading, there were five capitalized subheadings, each describing a particular kind of property (i.e., "GOLFER'S EQUIPMENT," "MUSICAL INSTRUMENTS," etc.). The last such subheading was entitled "FINE ARTS." Under the "FINE ARTS" heading were three indented paragraphs designated "(a)," "(b)," and "(c)." These paragraphs clearly referred to fine arts. Following these three indented paragraphs were four paragraphs which were not indented. The third of these four paragraphs stated: "This Company shall not be liable for more than the amount set opposite the respective articles covered hereunder, which amounts are agreed to be the value of said articles for the purpose of this insurance." None of these four unindented paragraphs (as illustrated by the one quoted) could be said to refer only to fine arts.

The policy also provided that ten percent of non-fire or lightening losses would be deducted from the insurance payable.

After the burglary, the Granthams filed a claim under the inland marine policy.

Shelter sought to limit its liability on the sterling, due to the decline in value of sterling between the time of the appraisal upon which the "Amount of Insurance" figure was based and the time of the loss. (Shelter admitted liability for the full insured amount on the silverplate and pendant, minus the deductible.)

■ Shelter argues that it had the right to replace the sterling. Under the language of the policy, the replacement option was not applicable to loss by theft. The replacement option's terms applied only to "property destroyed or damaged." Neither of these terms is applicable to stolen property; therefore, the replacement option was not available to Shelter.

Shelter also argues its liability is limited to the cost of replacing the silver at the time of the loss. Shelter essentially argues that the policy is an "open" policy, in which the company is liable only for the actual value of the insured property at the time of loss, rather than a "valued" policy, in which the company's liability is dictated by predetermined values assigned in the policy. See generally 6 J. and J. Appleman, Insurance Law and Practice § 3827 (rev. ed. 1982).[1]

■ Comparison of the valuation provisions in the basic policy and the "Property Covered" attachment reveals two conflicting statements. The basic policy limits Shelter's liability to the actual cash value of the sterling, and the "Property Covered" attachment states that the scheduled figures shall be deemed to be the value of the property for purposes of the policy. Shelter argues that the "VALUATION" section in the basic policy should govern and thereby limit its liability to the sterling's actual cash value. Shelter argues that the valuation clause in the attachment is a part of the "FINE ARTS" paragraph and applies only to fine arts property. Though the attachment's valuation clause is indeed found under the "FINE ARTS" heading, its placement is consistent with construction as a separate, new paragraph, and the language does not explicitly limit the clause's application to fine arts property. Ambiguities in insurance contracts are properly resolved in favor of the insured. Shelter Mutual Insurance Co. v. Brooks, 693 S.W.2d 810, 812[2] (Mo. banc 1985). Therefore, the ambiguity created by the conflicting valuation clauses should be resolved in favor of the Granthams, with the result that the actual-cash-value clause will be disregarded.

Moreover, the policy on its face shows that the premium was assessed as a per-

---

1. The parties have not briefed the question of whether this policy is governed by § 379.160(3) RSMo 1978, (the valued policy section), see *Huth v. General Accident & Life Assurance Corp.*, 536 S.W.2d 177 (Mo.App.1976), and therefore this court has not considered the question.

centage of the value of the items as listed on the attachment. Therefore, this case is governed by *Huth v. General Accident & Life Assurance Corp.*, 536 S.W.2d 177 (Mo. App.1976), in which the court held that a policy with a cash value clause in the basic policy was actually a valued policy because (*inter alia* ): (1) the premiums were based on the values of the property as listed in the policy; and (2) language in an attachment incorporated in the policy showed the parties' intent to override the cash value clause in the basic policy by valued policy language. Consequently, the policy in this case must be held to be a valued policy, and the trial court correctly entered judgment for the valued amount, less the deductible.

■ The Granthams argue that under § 408.020 RSMo, Cum.Supp.1984, they were entitled to prejudgment interest on their claim from the date of November 4, 1983, when Shelter replied to their proof of loss by offering only to pay an amount less than the full claim. The Granthams' claim was a contractual claim for an ascertainable amount, and therefore they are entitled to prejudgment interest at nine per cent from November 4, 1983. *See Francka v. Fire Insurance Exchange*, 668 S.W.2d 189, 190–91[5] (Mo.App.1984) (allowing prejudgment interest on insurance claim); *California & Hawaiian Sugar Co. v. Kansas City Terminal Warehouse Co.*, 602 F.Supp. 183, 190–91[19] (W.D.Mo.1985), *affirmed*, 788 F.2d 1331 (8th Cir.1986) (interest allowable on contract claim if amount of claim ascertainable).

■ The Granthams also argue that they should be awarded damages for vexatious refusal to pay, as well as their attorneys' fees, under § 375.420 RSMo 1978. The trial court found there was no vexatious refusal to pay. There was substantial evidence to support the trial court's finding that Shelter acted reasonably, and on this record there is no sufficient reason to disturb the trial court's finding of fact. *See Murphy v. Carron*, 536 S.W.2d 30, 32[1, 2] (Mo. banc 1976).

■ Finally, the Granthams argue that the trial court entered its judgment from the bench on May 30, 1985; therefore, they argue, the court lacked jurisdiction to enter its formal judgment more than 30 days after trial, and the Shelter appeal is untimely. The court had dictated findings of fact and conclusions of law into the record at the close of trial on May 30, 1985. The Granthams then submitted a proposed Formal Judgment for the court to enter. However, the court did not enter the Granthams' proposed judgment, but instead, on August 2, 1985, entered a formal judgment reducing the amount of the recovery stated in the dictated findings by the amount of the ten percent deductible. The Granthams' act in submitting a form for the final judgment shows that they believed the court's dictated findings and conclusions did not constitute the final judgment. Other correspondence submitted to this court indicates both parties and the court contemplated some further action on behalf of the court to make the judgment final. The test of whether a court has pronounced judgment is whether: (1) the court has uttered a pronouncement that it appears to have intended to operate as the determination of the parties' rights, and (2) the pronouncemen' rticulates in intelligible language wha  ose rights are. *Riek v. Riek*, 708 S.W.2d 826, 828[1] (Mo.App.1986), *quoting Munn v. Garrett*, 666 S.W.2d 37, 39 (Mo.App.1984). Since the actions of the court and both parties in this case show all of them contemplated the entry of a formal, final order after the court dictated findings into the record, the formal order, rather than the dictated findings, constitutes the judgment. *See Munn. v. Garrett*, 666 S.W.2d at 39[5]. Therefore, the court had jurisdiction to enter its August 2, 1985 judgment. For the same reason, the Granthams' motion to dismiss the appeal as untimely is denied, because the notice of appeal was filed within 10 days after the August 2, 1985 judgment became final.

The Granthams' motion for damages for frivolous appeal is denied.

The judgment in favor of the Granthams for $10,629 is affirmed. The judgment

failed to address the question of prejudgment interest, but the Granthams are entitled to that. This cause is remanded with directions for the court to calculate prejudgment interest on the judgment at the rate of nine percent from November 4, 1983 and to enter judgment in favor of the Granthams for that amount.

All concur.