SOUTHERN GUARANTY INSURANCE COMPANY, et al. *v.* DEAN

No. 43392          March 8, 1965          172 So. 2d 553

*Bryan & Gordon,* Pascagoula, for appellant.

*Albert Sidney Johnston, III,* Pascagoula, for appellee.

ETHRIDGE, J.

This case deals with the failure of an insured to comply with the provisions of fire and extended coverage insurance policies, to submit to examinations under oath by the insurer, and to produce for examination by insurer all pertinent records. Appellee, Mrs. Ruby Jones Dean, brought this action in the Chancery Court of Jackson County against Great American Insurance Company and Southern Guaranty Insurance Company, appellants, on insurance policies issued by these companies covering a restaurant building in Pascagoula, in the total amount of $65,000. The defendants pleaded, among other things, failure of the insured, Mrs. Dean, to comply with these provisions in their policies. After a lengthy hearing, the chancery court held the policies were valid. It rendered a decree against Southern Guaranty on its $20,000 policy, and held Mrs. Dean was entitled to have the $45,000 policy of Great American applied to her mortgage. See companion case, Great American Ins. Co. v. Smith, 252 Miss. 69, 172 So. 2d 553, decided March 8, 1965. The chancellor allowed appeals with a $40,000 supersedeas bond. We hold that insured failed and refused to answer questions in the examination under oath on matters which were material and relevant to the insurance and the loss, and failed and refused to produce for examination written documents which were pertinent and material to the insurance and loss. Failure of insured to comply in material respects with these contractual clauses bars her recovery under the policies. Hence the decree of the chancery court is reversed, and judgment is rendered here for appellants.

The pertinent clauses are the same in both policies, and provide:

This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto. . . . The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made.

Mrs. Dean and her husband moved to Pascagoula in January 1961. Her sister, Mrs. Rosie E. Norwood, and her husband owned and operated a restaurant there. Mrs. Dean rented the restaurant and operated it until August 1961, when she purchased it from her sister. She paid no cash for the property, but assumed a 1959 note and deed of trust to Mobile Fixture and Equipment Company, Inc., originally in the amount of $27,000, covering the fixtures, equipment, and four lots.

On May 23, 1962 Mrs. Dean and her husband borrowed $50,000 from Mrs. Mildred Smith. The loan was secured by a deed of trust covering the real property and the restaurant, and its equipment and fixtures, and an 80-acre tract of land in Bolivar County, Mississippi, which was subject to a prior lien. Part of the proceeds of this loan were used to pay off the Mobile Fixtures note and deed of trust.

On May 23, 1962 Mrs. Dean purchased a policy of fire and extended coverage insurance from appellant

Great American Insurance Company, providing $30,000 on the building and $15,000 on the contents. This deed of trust had a loss payable clause to Mrs. Mildred Smith. On December 6, 1962 Mrs. Dean purchased an additional policy of fire and extended coverage insurance, providing $15,000 on the building and $5,000 on the contents. Both policies contained the above-quoted clauses. This suit was brought by Mrs. Dean on the aggregate of this insurance, $65,000.

Around 10:30 p.m. on Sunday, January 6, 1963, the restaurant and its contents were totally destroyed, when there was an explosion in the building and fire ensued. An investigation was begun by the Pascagoula Police Department, the state fire marshal, and a special investigator of the National Board of Underwriters. There was a serious question as to whether there had been arson. The fire was preceded by a violent explosion which threw debris and brick on property in the vicinity. Within a week, investigating officers and representatives of appellants found, by removing the debris, that the thermostat control on the hot water heater had been turned to a very high point, and two gas valves on the stove and one situated on a pipe at the back of the gas stove were open. These facts were discovered by removing the debris, there was dust on the valves, and the valve at the rear of the stove was "frozen," all of which indicated it was unlikely that anyone had meddled with them after the fire.

The insurance companies had no information with reference to Mrs. Dean's financial affairs, nor those of the restaurant, and whether it was operating at a profit or loss. Mrs. Dean and her sister, Mrs. Norwood, who operated another restaurant, were intimate friends, and helped one another at their respective cafes on various occasions. The insurance companies had some information that Mrs. Dean up to a time shortly before the fire had been negotiating to lease her place. The fire

occurred on a Sunday night. The restaurant had been closed that day. According to a statement given by Mrs. Dean on January 8, two days after the explosion and fire, neither she nor her husband were in the restaurant that weekend after she closed it around 9:00 p.m. on Saturday; and she and her husband were the only ones who had possession of the key. They lived in a residence directly behind the cafe. She was positive that neither her husband nor anyone else was in the restaurant that day, according to her statement. Yet the insurance companies had some information by witnesses indicating that Mr. Norwood drove to the restaurant around four-thirty that Sunday afternoon in his small foreign car, and stayed in it without light for about an hour and a half.

The companies also knew there had been a tremendous explosion preceding the fire, and a man named Rutherford, who lived in a trailer at the back of the restaurant, moved out about 8:30 p.m. before the fire. They apparently also had information that some of the mortgaged equipment had been removed from the premises, although on the trial the record is ambiguous on this. Millette, who wrote the $45,000 insurance policy, said on the trial that Mrs. Dean did not advise him about the additional $20,000 insurance which she purchased in December 1962. She denied that, and the chancellor found against appellants on that issue, but this recollection of Millette also supported appellants' interest in getting a full disclosure on oral examinations from appellee. The company also had information indicating that there was a considerably excessive amount of insurance on the property. On the trial a general contractor stated that, after studying the building site, measurements, debris, and after conversations with Mrs. Norwood, the replacement cost of the building in his opinion would be $30,488.71, not including equipment. In 1959 a qualified realtor made an appraisal for Mobile Equipment of $30,000.

We do not consider or decide whether there was arson involved in this case. The evidence on the trial did not connect Mrs. Dean with anything of this sort. However, as the chancellor observed, there were "many serious circumstances in the case" which certainly justified the defenses of arson and over-insurance. There was "a strange silence of the Norwoods . . . ." There "may be strong suspicion but suspicion does not amount to evidence."

The significance of the foregoing circumstances lies in the context of these facts as they appeared to the insurance companies after the explosion and fire. They presented a typical situation to which the policy clauses on concealment and oral examination of insured, and full disclosure of all records were intended to apply.

■ ■ It is well established that such clauses in fire insurance policies are reasonable and valid, and are to be given a reasonable interpretation. If breached, the insurer would be deprived of a valuable right for which it contracted. Moreover, in an examination of the insured, all of those matters are material which have a bearing on the insurance and the loss. The insured is required to give the best information obtainable. 5 Appleman, Insurance Law and Practice §§ 3549, 3552 (1941) ; 45 C.J.S., *Insurance* §§ 1023, 1024 (1946).

■ ■ In reliance on the provisions of the insurance contracts, Great American made an examination of Mrs. Dean under oath on March 18, 1963, and Southern Guaranty made a similar examination on April 19. We have studied carefully and in detail these two examinations. We find that in many significant respects Mrs. Dean wholly failed and refused to comply with the clauses prohibiting concealment and requiring full disclosure on examination. She refused to answer material questions on the insurance and the loss, to make full disclosure under oath, and to reveal material facts. Under all of the authorities from this jurisdiction and elsewhere,

these actions by her operate to defeat the insured's right to recover under the policies.

One significant question pertained to the financial condition of this restaurant business and of Mrs. Dean, who owned and operated it. She said that she kept her own books, and they were destroyed in the fire. Yet she refused to permit appellants at their expense to make an examination of her checking accounts in banks in which apparently she deposited and withdrew money from the business, as well as personal funds. She refused to furnish appellants a copy of her 1961 income tax return, and to give them the information she admittedly had given her attorney, who was preparing her 1962 income tax return. She declined to obtain copies of cancelled checks from her bank for the two years prior to the loss, so that appellants could make an effort to reconstruct her business records. In short, she refused access to all available records and bank accounts which might be pertinent to the financial condition of the business, even though appellants offered to reconstruct these business records at their expense.

Mrs. Dean was vague and indefinite on the oral examinations as to what and how much she paid for the property which she purchased from the Norwoods. She refused to divulge the cost of the property and business when she purchased it with any approximate degree of certainty. She refused on the advise of her attorney to make comment on or answer questions concerning an oral statement given appellants' adjuster shortly after the building was destroyed, although some parts of this statement were relevant, including the number of keys to the restaurant, whether her husband had a key, and discussions about leasing the property. She declined to state on which bank she drew checks to purchase the business, and whether she had cancelled checks for its purchase. She declined either to give the gross business profits for the period immediately preceding

the loss, or give even an approximation of them, although she said the restaurant was operating at a profit. She refused to allow appellants to get copies of her gas bills for the three months immediately preceding the loss. She declined to answer questions concerning how the loan on the property was distributed by her and the mortgagee. She refused to answer questions relative to her own financial condition, and to give appellants a financial statement, although this related to what appellants at that time considered the defense of arson.

On the question as to how the money for the purchase of the property was distributed, appellants were concerned with whether other parties, apparently the Norwoods, owned a beneficial interest in this property. Yet Mrs. Dean declined to answer some questions relative to distribution of proceeds of the loan on the property by her and the mortgagee, although appellants were justified in thinking such disbursements were relevant on whether other persons owned an interest in it. She refused to give an inventory of the materials stored in the building at the time of the fire. She said that she was paying some bills for Mrs. Norwood as part of the purchase price, and that she had an oral promise to pay Mrs. Norwood $10,000. She had never paid her any of this, except that she paid some bills, which she declined to identify. This was pertinent on the purchase price. Again, Mrs. Dean declined to furnish copies of cancelled checks for the last two years before the fire, at the appellants' expense, although whether the business was profitable or unprofitable might have been revealed by these records, and it might have indicated whether anyone else owned a beneficial interest in the property.

Mrs. Dean refused to furnish or to permit appellants to obtain copies of her income tax withholding returns and social security payments for employees. She declined to state whether she had sufficient funds to make

the first payment of $6,585.33 on the note and deed of trust to Mrs. Smith, due June 30, 1963, about five months after the fire. There were other questions pertinent to the insurance and the loss which Mrs. Dean declined to answer, of less significance. Both examinations were had with Mrs. Dean's attorney present and advising her, and responding himself on many of the questions.

Appellee's failure and refusal to answer these material questions highly pertinent to the insurance and the loss require us to hold that she failed to comply with the concealment, examination, and disclosure clauses of the insurance policies, and that she is not entitled to recover on them. To hold otherwise would require an overruling of prior Mississippi cases. The facts of this case establish a stronger case of failure to comply with these clauses than those of earlier Mississippi decisions.

The definitive case in this state on this subject is Standard Insurance Company of New York v. Anderson, 227 Miss. 397, 86 So. 2d 298 (1956). The fire insurance policy contained similar concealment and examination clauses. The oral examination under oath of the insured revealed that he refused to disclose when he purchased the property, the consideration, whether he had competitors in the vicinity at the time of purchase, whether he made efforts to sell the property before the fire, and whether he attempted to obtain additional insurance. The Court cited with approval and following the leading case of Claflin v. Commonwealth Insurance Company, 110 U.S. 81, 3 S. Ct. 507, 28 L. Ed. 76 (1884). It was said that the object of these provisions is to enable an insurance company to possess itself of all knowledge and information as to other sources and means of knowledge, in regard to the facts, material to the insurer's rights, and to enable it to decide upon its obligations and protect itself against false claims.

The insurer was entitled to know all of the circumstances of the purchase of the insured property. The insured deliberately refused to answer questions on matters which were material, "and thus wilfully concealed such material facts and circumstances. The policy (*sic*) prohibited both concealment and misrepresentation. Consequently his concealment operated, under the provisions of the policy (*sic*), to deny and defeat his right to recover under them." Standard Ins. Co. of N.Y. v. Anderson, 227 Miss. at 409, 86 So. 2d at 302. A subsequent offer by new counsel for insured, after a mistrial of the case, to make available all information requested "came entirely too late."

Anderson v. American & Foreign Ins. Co., 227 Miss. 324, 86 So. 2d 303 (1956), followed *Standard Insurance,* which had reviewed all of the earlier decisions from this jurisdiction on this question.

In Boston Insurance Company v. Mars, 246 Miss. 36, 148 So. 2d 718 (1963), similar clauses were involved. The insured declined to submit to any examination under oath. It was said that the insurer "was entitled to conduct an examination of its own in regard to any fact connected with the loss." The fact that insured's attorney stated at the time and place for examination that he had the mortgage and insurance papers and would make them available to insurer's attorney was not a compliance with the examination and disclosure clauses. The refusal to submit to examination "was a violation of the express provisions of the insurance policy, and resulted in a forfeiture of (the) . . . right to recover under the policy."

Reversed and judgment rendered for appellants.

*Lee, C. J., and Gillespie, Jones and Patterson, JJ.,* concur.