## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 92-CA-01096-SCT

*MONTICELLO INSURANCE COMPANY AND ACCEPTANCE INSURANCE COMPANY*

*v.*

*JOYCE MOONEY AND FIRST NATIONAL BANK OF PONTOTOC*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 9/23/92 |
| TRIAL JUDGE: | HON. JOHN C. ROSS, JR. |
| COURT FROM WHICH APPEALED: | PONTOTOC COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | DAN W. WEBB |
| | JUDY HENRY SELF |
| ATTORNEY FOR APPELLEES: | OMAR D. CRAIG |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND REMANDED - 2/25/99 |
| MOTION FOR REHEARING FILED: | 4/24/96 |
| MANDATE ISSUED: | 4/12/99 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. The present case was considered by this Court in ***Monticello Insurance Co. v. Mooney***, No. 92-CA-01096-SCT (decided April 4, 1996). After full consideration, we grant Monticello Insurance Company's motion for rehearing. The original opinion is withdrawn and this opinion is substituted therefor.

¶2. This appeal arose from a September 23, 1992 order of the Pontotoc County Chancery Court finding that Joyce Mooney ("Mooney") had materially complied with the terms of her property insurance contract and ordering the insurers, Monticello Insurance Company ("Monticello") and Acceptance Insurance Company ("Acceptance"), to pay Mooney the difference between the amount of her policies ($130,000.00) and the amount paid to the mortgagee, First National Bank of Pontotoc ($98,216.62). In its initial opinion, this Court concluded the chancellor did not abuse his discretion in determining that Mooney had materially complied with the conditions of coverage as stated in the insurance contracts. We now reverse our earlier decision and find that Joyce Mooney materially breached the conditions of her policies with Monticello and Acceptance through her failure to supply financial records to the companies as required under the language of the policies.

I.

¶3. On February 3, 1990 a building owned by Joyce Mooney was destroyed by fire. Until about a year before the fire, the single-story structure located in Ecru, Mississippi had housed a meat packing operation, Little Rebel Meats, and a crafts shop. At the time of the blaze, the building was used to store unused equipment from Mooney's previous butchering operation and various items of personal property.

¶4. The building was insured under two policies: one issued by Monticello Insurance Company and the other issued by Acceptance Insurance Company, each in the amount of $65,000.00, providing total coverage of $130,000.00. The insurers paid $98,216.62 to First National Bank, the mortgagee, as full payment of its mortgage interest in the property as of April 6, 1990.

¶5. Joyce Mooney was listed as the sole insured on each policy. In addition, she was the sole owner of the property, and the mortgage on the building held by First National Bank of Pontotoc was in her name alone.

¶6. Mooney's policy provided:

> This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.
>
> * * *
>
> The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described and submit to examinations under oath by any person named by this Company, and subscribe the same; and, as often as may be reasonably required, *shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit abstracts and copies thereof to be made.*
>
> [emphasis added].

Pursuant to these provisions, on March 21, 1990 the insurers' attorneys notified Mooney and her husband, Ralph Mooney, that both would be required to submit to examinations under oath, and further, that they were required by the policy to produce personal, business and tax records and related financial information. Joyce Mooney submitted to an examination under oath on April 18, 1990. Ralph Mooney did not attend. The Mooneys argued he was not required to submit to an examination under oath because he was not a named insured under either policy. No financial records were produced at the examination or at any other time. Mooney explained this failure to produce the required records by asserting that any records pertaining to Little Rebel Meats had been burned in the fire. Additionally, Mooney explained that the records documenting their personal finances as well as records concerning her husband's business, Pontotoc Stockyard, were immaterial to the investigation.

¶7. Through correspondence, the insurers urged Mooney to reconsider her position with regard to the production of financial documents and her husband's testimony. She refused, asserting the records were immaterial, and production would be burdensome, time consuming and difficult.

¶8. On July 5, 1990, Monticello and Acceptance filed a Complaint for Declaratory Relief in the Pontotoc

County Chancery Court, asking the court to declare that due to Mooney's failure to produce the requested documents and to answer financial questions asked during the examination under oath, she had breached conditions of the insurance policies and could not recover under them. They further sought to recover from Mooney the $98, 216.62 paid to First National Bank.

¶9. In her response filed August 9, 1990, Mooney offered to cure the breach by complying with the insurers' requests for documents. However, her pleadings included a counter-claim for bad faith refusal to pay the entire claim. She sought to recover the $31,783.38 difference between the amount paid and the face value of the policies as well as $100,000.00 in punitive damages.

¶10. Monticello and Acceptance then filed a motion for summary judgment on November 1, 1990. They further requested permission to file an interlocutory appeal if the motion for summary judgment was denied. Mooney also filed a motion for summary judgment on January 28, 1991.

¶11. In an order filed March 5, 1991, the chancellor denied both motions for summary judgment and dismissed Mooney's claim for punitive damages with prejudice. In his order, the chancellor classified the information requested by the plaintiffs as material to the investigation, and instructed Mooney to produce all documents and information requested within thirty (30) days of the order. He further granted the insurers' request to file an interlocutory appeal, which was denied by this Court on September 19, 1991. Mooney never produced any of the requested records.

¶12. On September 25, 1992, the chancellor issued his final order. Relying on documentary evidence as well as trial testimony, he found Joyce Mooney had not materially breached the conditions of her policies with Monticello and Acceptance. Accordingly, the insurers were ordered to pay her the difference between the face value of the policies ($130,000.00) and the amount paid to First National Bank ($98,216.62), a total of $31,783.38 plus interest accrued since February 5, 1990.

## II.

¶13. This Court will not disturb the factual findings of a chancellor unless such findings are manifestly wrong or clearly erroneous. *Denson v. George*, 642 So. 2d 909, 913 (Miss. 1994); *Bowers Window & Door Co., Inc. v. Dearman,* 549 So. 2d 1309, 1312-13 (Miss. 1989). Therefore, as we stated in *Smith v. Dorsey*, 599 So. 2d 529, 533 (Miss. 1992):

> Whenever there is substantial evidence in the record to support the chancellor's findings of fact, those findings must be affirmed here. *Johnson v. Hinds County*, 524 So. 2d 947, 956 (Miss. 1988); *Culbreath v. Johnson*, 427 So. 2d 705, 707-08 (Miss. 1983). If a chancellor fails to make findings on issues of fact, this Court assumes that the issues were resolved in favor of the appellee. *Bryant v. Cameron*, 473 So. 2d 174, 179 (Miss. 1985). . . . For questions of law, our standard of review is de novo. *Harrison County v. City of Gulfport*, 557 So. 2d 780, 784 (Miss. 1990); *Cole v. National Life Ins. Co.,* 549 So. 2d 1301, 1303 (Miss. 1989); *Busching v. Griffin*, 542 So. 2d 860, 863 (Miss. 1989); *Boggs v. Eaton*, 379 So. 2d 520, 522 (Miss. 1980).

## III.

¶14. In light of pertinent case law viewed in conjunction with the specific facts of this case, we find that the chancellor erred in his determination that there was no material breach of the insurance policies held by Mooney. The chancellor concluded: (1) Mooney had not breached the terms of her insurance policies by

refusing to produce her husband, Ralph Mooney, for questioning at the examination under oath or "by failing to provide all information requested by Plaintiffs"; (2) Mooney had materially complied with the conditions of the policy "in that she truthfully answered all questions under oath to the best of her knowledge, and additionally authorized access to all information that was demanded"; (3) Mooney had provided the insurers with sufficient information to make an evaluation to determine the extent of their liability; and (4) the insurers had been given "ample opportunity to determine and acknowledge liability." We will address each conclusion individually.

¶15. It is a long standing principle that insurers must be given an opportunity to ascertain the finances of the insured in order to determine a possible motive in an arson fire. In the present case, the concerns of the insurers that arson had caused the fire were legitimate, and therefore an investigation was warranted.

¶16. During the trial, Rick Eley offered expert testimony concerning the origin of the fire. In his opinion, the building which housed Little Rebel Meats was destroyed by "an incendiary fire. . . . by that I mean it was intentionally set." In support of his opinion, Ely testified he had collected samples at the scene of the fire and submitted these samples to an independent laboratory. Three samples of the debris revealed the presence of gasoline and kerosene. In addition, Ely's initial report stated that he found in the debris a metal five gallon container which had obviously been inside the building at the time of the fire. Finally, Ely's investigation revealed that the fire originated from more than one source in the building, which is indicative of arson. The origination points were evidenced by melted copper, spalling on the concrete, the completeness of the burned debris in those areas, and other evidence of extreme heat temperatures. In light of this evidence, it is clear that the insurers had a legitimate reason to question the Mooneys' finances to determine a possible monetary motive in setting the fire.

a.

¶17. Regarding the chancellor's first finding, we have found that clauses in insurance policies which authorize insurers to conduct examinations under oath are reasonable and valid. *Allison v. State Farm Fire & Cas. Co.*, 543 So. 2d 661, 663 (Miss. 1989); *Souther Guar. Ins. Co. v. Dean*, 252 Miss. 69, 172 So. 2d 553, 556 (1965). We have further found that questions and documents relating to the business and personal finances of the insured are material to fire investigations. *Allison*, 543 So. 2d at 663; *Taylor v. Fireman's Fund Ins. Co*., 306 So. 2d 638 (Miss. 1974); *Dean*, 172 So. 2d at 556; *Standard Ins. Co. of New York v. Anderson,* 227 Miss. 397, 86 So. 2d 298 (1956). *See generally*, Vaeth, *Requirement Under Property Insurance Policy that Insured Submit to Examination Under Oath as to Loss*, 16 ALR 5th 412, 446-455 (1993 and Supp. 1995).

¶18. The chancellor found that Joyce Mooney was not required to produce her husband for questioning at the examination under oath. It is clear that the examination of Ralph Mooney would provide relevant information regarding his financial status and that of his wife at the time of the fire. However, according to the language of the policies, only an "insured" is required to submit to an examination under oath. Joyce Mooney is the only named insured under either policy. Although we agree that Ralph Mooney is not required by the policies to submit to a formal exam, information regarding his personal finances and that of Pontotoc Stockyard must still be relinquished due to Joyce Mooney's involvement in both. We refuse to require Ralph Mooney to submit to an exam and caution insurers to more carefully draft the policies if they wish to question spouses who may hold pertinent information concerning claims.

¶19. We do not agree with the chancellor's finding that Joyce Mooney was not required to provide all

information requested by plaintiffs. During her oral examination, she refused to provide records concerning both her personal financial status and that of Pontotoc Stockyard. All such records should have been provided.

¶20. While under oath, Mooney was questioned regarding ownership in the Pontotoc Stockyard. The following colloquy between Mooney and counsel for the insurers establishes the weakness of her argument that the Stockyard records were not discoverable:

Q: Do you have any ownership interest in Pontotoc Stockyard?

A: Well . . .

Q: Other than the general premise that it's because it's your husband's, you have some interest in it?

A. Right.

Q. All right.

A. I don't really own any of the business.

Q. Okay. The land is not in your name?

A. No.

Q. It's not in your's and your husband's name?

A. Yes.

Q. It is in your's and your husband's name?

A. Yes.

A. Okay. What about any debt? The debt that you have, is that in your's and your husband's name?

A. Yes.

Simply stated, she shared ownership in the stockyard with her husband. Additionally, the debt owed against the building was in their joint names.

¶21. In *Allison*, we stated that "persons claiming under a policy of insurance similar to the one *sub judice* and their attorneys should be aware that they are required to respond to all reasonable inquiries and to give all reasonable assistance and that failure to do so may well deny them recovery." *Id.* at 664. The inquiries in the present case were reasonable and the fact that Ralph Mooney was not listed as an insured under the policies had no relevance because Joyce Mooney held an interest in Pontotoc Stockyard. The financial standing of Joyce Mooney encompassed the financial standing of her husband and her husband's business in which she had an interest. Thus, the production of their joint financial records is required by the policy. The records are relevant to the determination of the financial condition of the insured, and the Mooneys improperly withheld this information from the insurers, thereby materially breaching the contract.

b.

¶22. The second conclusion of the lower court stated that Mooney had truthfully answered questions asked while under oath and had authorized access to all information demanded. We disagree with this portion of his finding.

¶23. A demand letter was mailed to Mooney by the insurance companies on March 21, 1990, requesting production of pertinent financial documents. No records were produced. On August 9, 1990, six months after the fire loss and after the insurers had filed a declaratory judgment action concerning the matter, Mooney offered to cure the breach by granting authority to copy those records of Pontotoc Stockyard deemed by the court as material to the investigation. In its order denying the parties' cross-motions for summary judgment, the Chancery Court found the requested financial records were material to the proceeding and ordered Mooney to comply with the insurers' requests. Still no documents were produced.

¶24. In order to make a valid determination as to Mooney's financial status, the insurance companies required records such as previous tax returns, a list of creditors to whom the Mooneys were in debt, and bank statements. We do not dispute the chancellor's finding that Mooney answered the questions asked at the exam to the best of her knowledge, but the simple act of answering questions concerning her financial position could not provide sufficient information to make a determination as to any possible monetary motive underlying the fire. In short, the insurers were entitled to reliable documentation to support and supplement Mooney's answers.

¶25. Furthermore, Mooney's belated offer to provide the records after the insurers had filed a declaratory judgment action did not cure the breach of the policy provision. In *Archie v. State Farm*, a Federal District Court case, an insured initially refused to submit to an examination under oath as required to recover under his insurance policy, but subsequently agreed to the exam after filing suit against the insurance company. *Archie v. State Farm Fire & Cas. Co.*, 813 F.Supp. 1208 (S.D. Miss 1992). The court found the tardy agreement did not cure the previous breach of the policy. "The policy provision requiring plaintiff to submit to the examination is clear and unchallenged. . . . Accordingly, the Court finds that plaintiff Archie's actions in not complying with the terms of the contract renders the policy null and void." *Id.* at 1213.

¶26. The failure to produce pertinent documents in the present case is analogous to the refusal to submit to an examination in *Archie*. The policy language requiring production is clear, and due to the insured's lack of diligence, the insurers were pressed into taking additional and unnecessary legal steps before Mooney offered to cooperate. Therefore, the breach was not cured by Mooney's offer. While we are not certain that we should adopt the *Archie* remedy in this cause, we are certain that the insurers are entitled to the full discovery of documents requested and will defer to the lower court to determine on remand whether to void the policy.

c.

¶27. The third conclusion by the chancellor maintains that Mooney had provided the insurers with sufficient information to make an evaluation to determine the extent of their liability. We do not agree. Mooney asserted that all records pertaining to Little Rebel Meats had been destroyed in the fire. Documentation of the Mooneys' personal finances was never produced, and although the insurers were eventually allowed to access the records of Pontotoc Stockyard, the records therein would not alone provide enough information on which to rely in ascertaining a possible motive behind the fire.

d.

¶28. The chancellor finally concluded that the insurers had been given ample opportunity to determine and acknowledge liability. In the present case, "opportunity" could be characterized by amount of time or by amount of information. The insurers were not provided with ample amounts of either. They never received enough information to support a determination, and it was not until after the insurers filed a declaratory judgment - six months after the fire loss - that the insurers received access to the records contained in the stockyard building. No adequate determination of liability could have been made under these conditions.

IV.

¶29. Upon review of the present facts and applicable law, we find manifest error in the holding of the lower court. Due to evidence indicative of arson in this case, the insurance companies were justified in seeking the financial records of Joyce Mooney, which necessarily included information pertaining to her husband who was not a named insured. The requested financial records should have been promptly provided. Therefore, this case is reversed and remanded to the Chancery Court for further proceedings consistent with this opinion.

¶30. **REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., AND SMITH, J., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, J. ROBERTS AND WALLER, JJ., NOT PARTICIPATING.**

McRAE, JUSTICE, DISSENTING:

¶31. With today's decision, the majority allows the insurance companies to become like hawks swooping down on their prey, free to impose whatever conditions they wish upon a first party insured, who is left without recourse to curb their overbearing conduct. How is the insured to say "Wait a minute! You're wrong!" to an insurer when the company demands unreasonable conditions of compliance under the pretext of the examination under oath? In this case, the chancellor, at the insurers' invitation through the filing of a declaratory action, served as arbitrator. He found that Moody had met her obligations to the insurers and dismissed her counterclaim for bad faith against them. His ruling should be affirmed. The evidence in the record before this Court supports the chancellor's findings that Mooney had not breached the terms of her insurance policies "by failing to provide all information requested by Plaintiffs;" that she had materially complied with the conditions of the policy "in that she truthfully answered all questions under oath to the best of her knowledge, and additionally authorized access to all information that was demanded;" that "[t]he Plaintiffs [sic] failure to avail themselves of her authorization is the result of their decision alone;" and that she had provided them with sufficient information to make an evaluation to determine the extent of their liability.

¶32. This action originated as a complaint for declaratory relief brought by Monticello and Acceptance Insurance Companies to determine whether Mooney's alleged failure to produce the requested documents

and to answer financial questions raised during the examination under oath served to breach the conditions of the insurance policies.[(1)] Thus, the chancellor, not the insurance companies, was the trier of fact and in essence, the arbitrator. This is how it should be. The evidence in the record supports his findings; his decision was neither manifestly wrong nor clearly erroneous as it must be for this Court to reverse. I therefore disagree with the majority's analysis in finding that Mooney failed to comply materially with the terms of her insurance contract. Accordingly, I dissent.

¶33. After a building is damaged or destroyed by fire, an insurance adjuster takes a recorded statement from the named insured and requests documentation of the losses sustained. Later, an attorney for the insurer writes a letter to the insured demanding that he provide the insurer with whatever documentation might be requested and give a statement under oath, generally at the attorney's office. More often than not, the insured, unlike the insurer, is not represented by counsel.

¶34. For the past twenty years, the insurance industry and its attorneys have taught its legal personnel that the "real" purpose of the statement under oath is to get the insured to commit some coverage violation so that the policy can be denied on that basis rather than proving arson which requires a higher burden of clear and convincing proof. The insurer sets the "stage " by saying that the fire possibly was incendiary in origin, demanding that the insured produce voluminous documents and submit to unbridled cross examination. Thus, the statement under oath is required by the insurer, knowing that it provides an opportunity for the unwitting insured to violate the terms of the policy. The insurer then may deny the claim in its entirety for the insured's failure to comply with the insurer's definition of its policy terms. The industry has promoted this as a better way of voiding the policy than to allege arson, since arson must be shown by clear and convincing evidence and insurance coverage questions need only be resolved by a preponderance of the evidence.

¶35. This Court has found that clauses in insurance policies which authorize insurers to conduct examinations under oath are reasonable and valid. ***Allison v. State Farm Fire & Cas. Co.***, 543 So. 2d 661, 663 (Miss. 1989); ***Southern Guar. Ins. Co. v. Dean,*** 252 Miss. 69, 76, 172 So. 2d 553, 556 (1965). "Mississippi law is clear that a policy is rendered void where an insured either fails to submit to an examination under oath or refuses to answer material questions during an examination under oath." ***United States Fidelity & Guar. Co. v. Wigginton***, 964 F.2d 487, 490 (5th Cir. 1992)(citations omitted); ***Allison***, 543 So. 2d at 663. Questions and documents relating to the business and personal finances of the insured generally have been found to be material to fire investigations. ***Allison***, 543 So. 2d at 663; ***Taylor v. Fireman's Fund Ins. Co***., 306 So. 2d 638 (Miss. 1974); ***Dean***, 252 Miss. at 76, 172 So. 2d at 556; ***Standard Ins. Co. v. Anderson,*** 227 Miss. 397, 86 So. 2d 298 (1956). ***See generally***, Christopher Vaeth, Annotation, ***Requirement Under Property Insurance Policy that Insured Submit to Examination Under Oath as to Loss***, 16 A.L.R. 5th 412, 446-455 (1993 & Supp. 1998).

¶36. In ***United States Fidelity & Guar. Co. v. Conaway,*** 674 F. Supp. 1270 (N.D. Miss. 1987), *aff'd mem.* 849 F. 2d 1469 (5th Cir. 1988), which the insurers assert is "on all fours" with the case *sub judice*, the district court relied on Mississippi law in granting summary judgment in favor of the insurance company because of the insured's failure to answer questions about his income and produce financial records. However, in that case, as distinguished from the case *sub judice,* there was substantial evidence of arson and that Conaway, the insured, had made various misrepresentations on his proof of loss and during the course of investigation regarding the cause of the fire including that there was only one fire, and not two; and that the unoccupied house that burned was his sole residence. To the contrary, there is no evidence that Mooney made any misrepresentations in her proof of loss or during any other phase of the investigation.

Further, Mooney did not refuse to answer questions about her financial matters; at worst, she was sometimes lacking in her knowledge of the information sought.

¶37. The insurers further rely on *Allison v. State Farm Fire & Cas. Co.*, 543 So. 2d 661, 663 (Miss. 1989), where we also upheld summary judgment in favor of the insurer. In that case, an incendiary fire destroyed the home of insureds who were separated, but staying together in a second home they owned. The insureds refused to sign authorizations which would have provided the insurer with access to their financial records and, on the advice of counsel, refused to answer questions regarding evidence of indebtedness, bank records, loans, ownership of the subject property, salary information, mortgage payments and credit history. *Allison*, 543 So. 2d at 662. Although the lower court's judgment was affirmed, we cautioned:

> We are not suggesting, nor do the authorities support, a rule that the insurer may ask anything of the insured as part of the examination and refuse coverage because of any refusal to answer. **We reject the notion that the insurer is the sole judge of materiality.**

*Id.* at 664 (emphasis added). In contrast to *Allison*, Mooney was forthcoming with the financial information available to her regarding the subject property and the businesses that had been conducted there. In *Allison*, we further stated that "persons claiming under a policy of insurance similar to the one *sub judice* and their attorneys should be aware that they are required to respond to all reasonable inquiries and to give all reasonable assistance and that failure to do so may well deny them recovery." *Id.* at 664. Mooney's only refusals to answer had to do with her husband's separate stockyard operation. Those refusals were based on lack of materiality and the burdensome task of producing the daily operating records the insurers sought. The chancellor apparently did not find her actions to be unreasonable.

¶38. As in *Allison*, the insureds in *Southern Guaranty Ins. Co. v. Dean*, 252 Miss. 69, 172 So. 2d 553 (1965), refused to answer questions about financial matters pertaining directly to the subject property as well as about the loss itself. In contrast, Mooney answered questions to the best of her ability about financial matters related to Little Rebel Meats and the building that burned, with both Mooneys authorizing the insurer to inspect the remains of the building. Moreover, in *Dean*, the insured refused the insurer access to all available records and bank accounts that might have been used to help reconstruct a financial picture of the burned business, even though the insurer "offered to reconstruct these business records at their expense." 252 Miss. at 77, 172 So. 2d at 556. As distinguished from *Dean*, Mrs. Mooney's objection to producing documents from her husband's separate business was based largely upon the sheer volume of material and the exorbitant costs involved in producing it -- which the insurers had not offered to pay.

¶39. The insurers further maintain that Mooney's failure to agree to provide them with access to the records of the Pontotoc Stockyard until she filed her response to the Complaint for declaratory judgment does nothing to cure her initial alleged breach -- failing to produce the documents at the examination under oath. Their reliance on *United States Fidelity & Guar. Co. v. Wigginton*, 964 F.2d 487, 490 (5th Cir. 1992), is somewhat tenuous. In that case, the insured initially refused to submit to an examination under oath until he decided whether to waive his right against self-incrimination in the arson charges he faced. *Wigginton*, 964 F.2d at 491. When he agreed to an examination three months after the insurer's motion for summary judgment was filed, it was premised on what the court found to be the unreasonable condition that the insurer waive its rights with regard to voiding the policy. *Id*. Accordingly, this subsequent offer to submit to the examination under oath was not found to cure the initial breach. As distinguished from

*Wigginton*, Mooney did not refuse to submit to the examination under oath. Production of documents, which was not addressed in *Wigginton*, was the only matter in question. Further, Mooney's subsequent acquiescence to make the stockyard documents available was not predicated upon any unreasonable conditions; she asked only that the court determine what was material and that the insurers reproduce what they needed at their expense.

¶40. The facts of this case are distinguishable from those cases where the insured's lack of candor or cooperation with regard to an examination under oath has warranted the insurer's refusal to honor its policy. Moreover, the evidence in the record supports the chancellor's findings that Mooney materially complied with the policy by answering the questions put to her in the examination under oath and authorizing access to the information the insurers sought. Our standard of review requires that a chancellor's findings of fact be left untouched unless manifestly wrong or clearly erroneous. The evidence in the record supports the chancellor's findings that Mooney materially complied with the terms of the policy. All of the relevant case law which, at first blush, might appear to support a decision favorable to the insurer, is factually distinguishable from the case *sub judice*.

¶41. In this case, it was the insurers who sought a declaration of the parties' rights. However, M.R.C.P. 57 could just as easily provide an avenue for the insured, who badgered by and disputing an insurer's demands during an examination under oath, needed an arbitrator to determine where to draw the line and determine the extent to which she must comply without risking the loss of benefits payable to her. The court, when entertaining a complaint for declaratory relief, "is not limited only to remedial relief for acts already committed or losses already incurred; it may either substitute or add preventive and declaratory relief." Comment, M.R.C.P. 57. An insured placed in the position of Joyce Moody by her insurer during the examination under oath thus need not just succumb to the demands placed on her by the insurer; rather Rule 57 provides an opportunity for her to have her rights adjudicated.

¶42. Mooney's counterclaim for bad faith refusal to pay the entire claim was dismissed by the chancery court. It is ironic that when the insured is perceived by the insurer to have breached the insurance contract, the insured's death warrant is signed and he may not recover the benefits due him; yet when the insurer acts to breaches its contract with the insured, it receives, at most, a mere slap on the hand. Only when the insurer's actions in breaching the contract are so egregious as to amount to a separate and independent tort, proven by clear and convincing evidence, might it be subject to a punitive damages claim. Shouldn't the same burden be placed on the insurer when it alleges a coverage violation by the insured? Because I would affirm the decision of the court below, which properly acted as fact finder and arbitrator in this case, I dissent.

**BANKS, J., JOINS THIS OPINION.**

1. Initially, the insurers sought to have Mooney produce her husband, who was not a named insured, to give a statement under oath in contravention of the spousal privilege provided for in Miss. Code Ann. § 13-1-5 (Supp. 1998), as well as in Rule 504 of the Mississippi Rules of Evidence, limiting the extent to which

confidential communications between husband and wife may be admitted as evidence. Under neither the statute nor the rule can one spouse be required to provide discoverable information about the other without the consent of both spouses.